**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | |
|---|---|
| **MARY JETER,** | ] |
| | ] |
| **Plaintiff,** | ] |
| | ] |
| **vs.** | ]    **Case Number: 2:06cv1043-MHT** |
| | ] |
| **MONTGOMERY COUNTY,** | ] |
| | ] |
| **Defendant.** | ] |

**DEFENDANT MONTGOMERY COUNTY'S MEMORANDUM BRIEF
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

COMES NOW Defendant Montgomery County and submits the following Memorandum

Brief in Support of Motion for Summary Judgment.

## I.  FACTS

Mary Jeter ("Jeter") is a probation officer at the Montgomery County Youth Facility

("MCYF").  (Howell Affidavit,   ¶ 3)  Jeter has been employed with the MCYF since May 1, 1974.

( Howell Affidavit, ¶ 3; Jeter depo., ex. 1thereto)   Jeter's position is part of the classified service

for Montgomery County as defined by the rules and regulations of the Montgomery City-County

Personnel Board ("Personnel Board").  (Howell Affidavit, ¶ 3; Jeter depo., p. 35, line 10 - p. 36, line

6)  Jeter has received merit increases in salary during her employment.  ( Montoya Affidavit, ¶ 3)

The salaries/increases are established by the Personnel Board.  (Montoya Affidavit, ¶ 3 Howell

Affidavit, ¶ 3) Jeter and  other probation officers at the MCYF have reached the top of the pay scale

for their positions under the pay plan established by the Personnel Board.   (Howell Affidavit, ¶ 3;

Jeter depo., p. 28, lines 3-12)   Jeter and these probation officers are the highest paid juvenile

probation officers in the state of Alabama.  (Howell Affidavit, ¶ 3)

1

Jeter filed this lawsuit because a comment was made at a county commission meeting on October 3, 2005, to wit, that the county probation officers "were overpaid." (Jeter depo., p. 25, lines 1-4; p. 201, lines 25 - p. 206, line 9; p. 207, line 21 - p. 208, line 12; p. 209, line 18 - p. 210, line 5; Howell Affidavit, ¶ 14) Jeter was not happy about this remark, and in January of 2006, Jeter's attorney sent a letter to Howell and Wooten seeking overtime wages for home detention calls Jeter allegedly made during 2002-2006. (Howell Affidavit, ¶ 14, ex. D thereto; Jeter depo., p. 25, lines 1-4; p. 201, lines 25 - p. 206, line 9; p. 207, line 21 - p. 208, line 12; p. 209, line 18 - p. 210, line 5) This lawsuit for overtime wages, with the additional claims for racial discrimination and retaliation, followed.

Jeter's immediate supervisor is Juvenile Probation Supervisor Steve Wooten ("Wooten"). (Howell Affidavit, ¶ 4; Jeter depo., p. 35, lines 6-9; Wooten Affidavit, ¶ 2) In Wooten's absence, Jeter is to report to the other Juvenile Probation Supervisor, Beverly Riddle Wise. (Howell Affidavit, ¶ 4; Jeter depo., p. 247, line 2 - p, 248, line 1) Both Wooten and Wise report directly to Howell. (Howell Affidavit, ¶ 4; Wooten Affidavit, ¶ 2)

The majority of probation officers at the MCYF handle a full, traditional case load of juvenile files. (Howell Affidavit, ¶ 5) Prior to 2002, Jeter was also handling a full case load like the majority of the probation officers. (Howell Affidavit, ¶ 5) Normal work hours for the probation officers are 8:00 a.m.- 5:00 p.m. Monday through Friday. (Howell Affidavit, ¶ 5)

At some point prior to 2002, Jeter told Howell and Wooten that she was burned out. (Howell Affidavit, ¶ 6; Wooten Affidavit, ¶ 3) She said that she was supervising the children of children she had previously supervised years ago. (Howell Affidavit, ¶ 6) Howell agreed that Jeter did not have to keep her full case load, and Jeter was eventually placed in charge of the Youth Court

2

Program and the Intern Program at the MCYF.  (Bruce Howell Affidavit, ¶ 6; Jeter depo., p. 48, line 22 - p. 50, line 11; p. 102, line 22 - p. 104, line 4) Youth Court was not a year- long program, but was active from September - April.  (Wooten Affidavit, ¶ 4; Jeter depo., p. 51, lines 4-17) Jeter was also handling a few restitution cases at this time as well.  (Howell Affidavit, ¶ 6)

Judge Richard Dorrough was previously the presiding judge of the Montgomery County Juvenile Court.  (Howell Affidavit, ¶ 7)  Judge Dorrough decided to institute a home detention program. (Howell Affidavit, ¶ 7; Jeter depo., p. 81, lines 7-8)  Youths were placed on home detention until their next hearing before the Juvenile Court.  (Howell Affidavit, ¶ 7)  Electronic monitoring of detainees on home detention was not a viable option at that time so it was decided that telephone calls would be made to the youths at different times of the day.  (Id.)  Youths were generally not on home detention for any significant amount of time.  (Id.)  This was a temporary measure to monitor these youths until their next hearing before the juvenile court.  (Id.)  Rarely were the youths kept on home detention past the second hearing.  (Id.)  The amount of time the youths were on home detention was not significant, with the longest being approximately six weeks.  (Id.) Generally these cases moved fairly quickly.   (Id.)

During the relevant time period, 2002-2006, Jeter worked Monday through Friday, and was off on Saturday and Sunday.  (Jeter depo., p. 52, line 22 - p. 53, line 25)  Because Jeter did not have a full case load anymore, and due to the fact the Youth Court program was only active for part of the year, Jeter was assigned the duty of making home detention calls on her regular work days, Monday through Thursday.  (Howell Affidavit, ¶ 8; Jeter depo., p. 132, line 15 - p. 133, line 18; Wooten Affidavit, ¶ 5) Probation Officer Phoenix Martin worked Wednesday through Sunday, and Martin was assigned the duty of making the calls on the weekends, Friday through Sunday.  (Howell

Affidavit, ¶ 8; Wooten Affidavit, ¶ 5) Jeter could make the calls any time she chose, and she could make them from any location or from any phone she chose. (Jeter depo., p. 148, line 24 - p. 150, line 22)  A cell phone was provided to Jeter by the MCYF to make these calls.  (Howell Affidavit, ¶ 8) Wooten told Jeter and Martin they could make the calls during their regular work hours if they wanted. (Wooten Affidavit, ¶ 5)  He also told them to call at different times of the day so the youths would not be expecting calls at a certain time every day.  (Id.)

It was in the discretion of the juvenile court judges as to whether a youth would be placed on home detention.  (Howell Affidavit, ¶ 8)  Once a judge placed a youth on home detention, the case for that youth was sent to Jeter.  (Id.)  There was no formal procedure that required Jeter or Martin to submit or prepare a report to the court or their supervisor regarding the home detention calls that they made.  (Id.)      Howell, Wooten, Jeter and Martin all agreed that the home detention program was not reliable because it was not possible for the probation officer to authenticate over the telephone that he/she was speaking with the youth who was called.  (Howell Affidavit, ¶ 9) The judges also used "parental supervision" which did not require a probation officer to call the youths at home.  (Id.)  With parental supervision, the youths' parents agreed to regularly report to the probation officer whether the youth was at home.  (Id.)  Parental supervision was used approximately 50% of the time instead of home detention.  (Id.)  Home Detention was generally used for the most serious cases.  (Id.)

Employees at the MCYF are paid every two weeks.  (Howell Affidavit, ¶ 10)  A payroll certification sheet is prepared by the payroll clerk every payroll period and given to employees to review and sign.  (Id.; Jeter depo., p. 125, line 1 - p. 129, line 19)  If any overtime has been worked, employees must verify the amount of hours worked and elect whether they would like to receive

4

overtime pay or compensatory leave.  (Id.)   These requests for overtime are signed by the employees' supervisor.  (Id.)   Rule VIII, Section 2(a)(2) of the Rules and Regulations of the Personnel Board govern overtime work by classified employees at the MCYF.  (Howell Affidavit, ¶ 10, ex. A, p. 17; Montoya Affidavit, ¶ 5, ex. 1 thereto)  This rule provides that employees are entitled to either overtime pay or compensatory leave at time and a half if they work over 40 hours per week.  (Howell Affidavit, ex. A, p. 27)   Neither Howell or any other supervisor at the MCYF has the authority to make or change the rule regarding compensation for overtime.  (Howell Affidavit, ¶ 10)  This is the function of the Personnel Board.  (Id.)  Jeter was provided with a county handbook and other written materials explaining the rules on overtime.  (Jeter depo., p. 75, line 18 - p. 78, line 18, exs. 5, 6, 7 thereto)

The payroll records of the MCYF show that during the time Jeter was making home detention calls, she submitted requests for either overtime pay or compensatory leave for home detention calls.  (Howell Affidavit, ¶ 11, ex. B)  On each occasion Ms. Jeter submitted a request for overtime pay/compensatory leave for making home detention calls, she received pay or compensatory leave.  (Howell Affidavit, ¶ 11; Jeter depo., p. 88, line 22- p. 89, line 3; p. 204, line 22 - p. 205, line 10; Wooten Affidavit, ¶ 5)  Howell and Wooten testified that they never told Jeter that she could not receive overtime for making home detention calls. (Howell Affidavit, ¶ 11; Wooten Affidavit, ¶ 5) Wooten approved several written requests for overtime pay/compensatory leave submitted by Jeter for calls on the home detention program.  (Wooten Affidavit, ¶ 5)  Howell and Wooten regularly saw Jeter arriving to work after 8:00 a.m., and leaving before 5:00 p.m., and assumed she was also flexing her hours. (Howell Affidavit, ¶ 12; Wooten Affidavit, ¶ 5) The payroll certification sheets signed by Jeter each pay period do not reflect that she was working any overtime

5

hours without getting paid or receiving leave.  (Howell Affidavit, ¶ 13)  The MCYF had no reason to doubt the accuracy of these records, and they are relied upon by Montgomery County in the payment of overtime.  (Howell Affidavit, ¶ 13)

On January 31, 2006, Jeter's attorney sent a letter to Howell and Wooten that stated Jeter was seeking overtime compensation for making home detention calls dating back to 2002.  (Howell Affidavit, ex. D thereto)   Jeter continued to submit written requests for overtime for making home detention calls, and for other reasons.  These requests were approved and Jeter  was compensated with overtime pay or compensatory leave on each occasion.  (Howell Affidavit, ¶ 14, ex. E thereto)

After Judge Dorrough was replaced by Judge Patricia Warner in early 2006, Howell decided to discontinue the home detention program.  (Howell Affidavit, ¶ 15)  Both Jeter and Martin were advised that the home detention program would no longer be used.  (Howell Affidavit, ¶ 15) The decision to discontinue the home detention program was based on the fact that Judge Dorrough (who founded the program) was no longer a judge at the Juvenile Court, and the fact that the program was simply not an effective tool in monitoring youths at home. (Id.; Wooten Affidavit, ¶ 6)

Once the home detention program was no longer in use Howell assigned several restitution/money cases to Jeter.  (Howell Affidavit, ¶ 16)  All probation officers handle restitution cases, and Jeter had previously handled restitution cases.  (Id.)  Howell felt that Jeter was the most logical person to work these money cases because she only had Youth Court (which was part time) and the intern program. (Id.)  Jeter had the lightest workload of all probation officers. (Id.)

In   December of 2006, Wooten and Jeter devised a new work schedule for Jeter while working on Youth Court. (Howell Affidavit, ¶ 17, ex. F thereto; Wooten Affidavit ¶ 7) This schedule requires that Jeter work Tuesday - Friday for a total of 40 hours per week.  She is off on Saturday,

Sunday and Monday. (Wooten Affidavit, ¶ 7 ) This was part of an agency-wide effort to streamline work schedules and reduce the amount of overtime being paid by the MCYF, and was not directly solely to Jeter. (Wooten Affidavit, ¶ 7; Howell Affidavit, ¶ 17, exs. G and H thereto) Jeter is still eligible for overtime under her revised Youth Court Schedule and has in fact received overtime/compensatory leave under the revised work schedule. (Wooten Affidavit, ¶ 8; Jeter depo., p. 59, line 1 - p. 60, line 9; Howell Affidavit, ¶ 14, ex. E thereto) When Youth Court is not active, Jeter's hours are 8:00 am. - 5:00 p.m. Monday - Friday. (Wooten Affidavit, 8)

## II. PROCEDURAL BACKGROUND

On October 25, 2006, Jeter filed a Complaint against the MCYF and Bruce Howell in the Circuit Court of Montgomery County, Alabama. The action was removed to the United States District Court for the Middle District of Alabama, Northern Division, on November 20, 2006. (Doc. # 1) A Motion to Dismiss the Complaint was filed on November 27, 2006 on the grounds that the youth facility was not an entity capable of being sued and because Jeter had failed to state a claim against Howell upon which relief could be granted. (Doc. # 2)

On December 12, 2006, Jeter filed a First Amended Complaint asserting claims only against Defendant Montgomery County. (Doc. # 7) Defendant Montgomery County filed a Motion to Dismiss the First Amended Complaint on January 16, 2007 for failure to state a claim. (Doc. #. 16) On January 26, 2007, Jeter filed a Second Amended Complaint against Defendant Montgomery County. Jeter asserts three claims against Montgomery County: (1) FLSA claim for overtime wages pursuant to 29 U.S.C. § 207; (2) claim for racial discrimination in violation of the equal protection clause of the Fourteenth Amendment; and (3) retaliation claim under the FLSA pursuant to 29 U.S.C. § 215.

7

## III. ARGUMENT

**A.    FLSA Claim for Overtime Wages.**

In *Scott v. Harris,* 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007), the Court stated the following

which is applicable in this case:

> At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts. Fed. Rule Civ. Proc. 56©. As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56©, its opponent must do more than simply show that there is some metaphysical doubt as to the material facts ... **Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"** *Matsushita Ele. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)(footnote omitted). "[T]he existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-248, 106 Sct. 2505, 91 L.Ed.2d 202 (1986). **When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.** That was the case here with regard to the factual issue whether respondent was driving in such fashion as to endanger human life. Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him.

*Id.* at 1776. (Emphasis added). *See also, Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct.

2505, 91 L.Ed.2d 202 (1986)(an issue is not genuine if it is unsupported by evidence or if it is

created by evidence that is "merely colorable" or is "not significantly probative." 477 U.S. at 250;

*accord Spence v. Zimmerman,* 873 F.2d 256 (11th Cir. 1989).

In the present case, Jeter's contention that she was not allowed to receive overtime for

making home detention calls is "blatantly contradicted" and "utterly discredited" by the payroll

records of the MCYF.  *Scott,* 127 S.Ct. at 1776. When confronted with the payroll records Jeter acknowledged in her deposition that she did in fact receive either overtime pay or compensatory leave for home detention calls.  She also admitted that she just cannot explain the inconsistencies between her claim and the documentary proof in the payroll records.  Based on the record, no rational trier of fact could believe that Jeter has been denied overtime wages/compensatory leave for home detention calls, and summary judgment for Montgomery County should be granted. *Matsushita,* 475 U.S. at 587.

1.     In Jeter's Second Amended Complaint, she alleges she "was not compensated for her calling assignments performed five nights a week, Monday through Thursday. On the weekends, a white employee was assigned to make the calls as part of her 40-hour work week. Plaintiff only received overtime pay, 2 hours per night, when she took over duties for the white employee on the weekend." (Second Amended Complaint, p. 2, ¶ 3) Plaintiff further alleged that she "was never told by supervisors that she was eligible for overtime or compensation for the time worked.  A white female who was assigned the duties in Plaintiff's absence, was paid overtime."  (Second Amended Complaint, p. 2, ¶ 4)  Jeter also signed an affidavit on January 27, 2007.  (Jeter depo., ex. 21 thereto) In her affidavit, Jeter testified that "I was never told that I could be paid overtime for this work, and I did not volunteer to do the work.  I was not offered comp time, either, unless I covered for another employee." (Jeter depo., ex. 21 thereto, no. 3)

The overtime certification sheets signed by Jeter, however, show that Jeter did submit overtime requests and that she received overtime pay or compensatory leave for home detention calls on several occasions.  (Jeter depo., exs. 11-18 thereto.)  Jeter's testimony clearly contradicts her own overtime certification sheets that she signed and submitted to the MCYF.

2.    When Jeter's deposition was taken, she testified that she was <u>actually told</u> by Bruce Howell and Steve Wooten that she could not get overtime for home detention calls unless she covered for Phoenix Martin on the weekends, or she was at the facility on her regular work days, Monday - Thursday, and she made home detention calls after hours while she was also working on Youth Court.  (Jeter depo., p. 61, line 10 - p. 63, line 17; p. 144, line 9 - p. 145, line 20; p. 189, line 12 - p. 190, line 4)  According to Jeter, she was told that she could not get overtime for home detention when she left the facility and made home detention calls on her work days, Monday through Thursday.  (Jeter depo., p. 61, lines 13-14; p. 167, line 23 - p. 169, line 9)

The overtime certification sheets signed by Jeter, and certified by her to be correct, completely discredit this claim.  For example, the overtime certification sheet signed by Jeter for July 29, 2002, shows that Jeter made home detention calls on her regular work day of Monday, July 29, 2002, and that she received credit.  (Jeter depo., p. 159, lines 1 -18, ex. 11 thereto)  This flatly contradicts Jeter's deposition testimony to wit, that she was not allowed to get overtime for home detention calls made on her regular work days.  Youth Court was not in session at this time either because it was summer.  (Wooten Affidavit, ¶ 4; Jeter depo. p. 170, lines 18-20)  Therefore, this would not have been a day when Jeter was at the facility making calls on Youth Court and decided to make some home detention calls too.  Jeter offered no explanation for this discrepancy. This is contrary to her story that she was told she could not receive overtime for offsite work on her regular work days making home detention calls.

3.    Jeter also signed and submitted an overtime certification form for home detention calls made on a holiday that fell on Thursday, one her regular work days. (Jeter depo., p. 160, line 19 - p. 163, line 11, ex. 12 to Jeter depo.) Jeter was off work that day (out of the building), yet she

10

was allowed to receive overtime credit for making home detention calls on a Thursday, one of her normal work days. (Jeter depo., p. 161, line 8 - p. 163, line 11, ex. 12 thereto) The same is true for her overtime certification form submitted on June 6, 2005, a holiday on Monday. These payroll records flatly contradict Jeter's deposition testimony above that she was not allowed to receive overtime for home detention calls on Monday - Thursday, while away from the facility. Jeter attempted to explain this by saying that if it was a holiday, and she made calls, even away from the facility, she could claim overtime for these calls because she was "off work legally." (Jeter depo., p. 162, line 1 - p. 164, line 2) This makes no sense, however, because Jeter testified earlier in her deposition that she was only allowed to claim overtime for home detention calls on her regular days when in the building and "on the clock" doing Youth Court duties. (Jeter depo., p. 62, line 20 - p. 64, line 12)

4.      Jeter also signed and submitted an overtime certification sheet for August 19, 2004, a Thursday. (Jeter depo., p. 166, line 19 - p. 167, line 16, ex. 14 to Jeter depo.) Jeter claimed no time for Youth Court that same day so she was obviously not performing any Youth Court duties after hours that same day. This overtime certification form clearly contradicts Jeter's earlier testimony that she was told she could not get overtime for home detention calls on her regular work days (Monday-Thursday) unless she was at the facility working on Youth Court.

5.      Jeter also submitted an overtime certification form and was given credit for overtime for home detention calls made on Wednesday, August 25, 2004. (Jeter depo., p. 172, line 13 - p. 173, line 7, ex. 14 to Jeter depo.) Again, Jeter claimed no time for Youth Court that same day so she was obviously not performing any Youth Court duties after hours that same day. This is also contrary to her story that she was told she could not get overtime for home detention calls on her

11

regular work days unless she was at the facility working on Youth Court.  Jeter simply testified that she could not explain the discrepancy.

> Q.     And then the last one is August 25th which is a Wednesday.  You asked for one hour of home detention.
>
> A.     Wednesday I work Youth Court.
>
> Q.     Where's the Youth Court?
>
> A.     Is there another sheet there for it?
>
> Q.     No, there's not.  There's just one for home detention.
>
> A.     Then I can't explain it.

(Jeter depo., p. 172, lines 13-23)

6.     The same is true with respect to Jeter's overtime certification form for Tuesday, August 31, 2004.  (Jeter depo., ex. 14 thereto)  It shows only home detention calls made on Tuesday, her regular work day, but there is no request pertaining to Youth Court duties the same day.  Again this is contrary to Jeter's story that she could only get paid for home detention calls on her regular work days if she as at the facility after hours performing Youth Court duties.

7.     Jeter also signed and submitted an overtime form for home detention calls made on Wednesday, November 24, 2004.  (Jeter depo., p. 178, line 20 - p. 179, line 8; ex. 16 thereto)  This was the day before Thanksgiving, but not a holiday.  (Jeter depo., p. 179, line 12 - p. 181, line 3)  There were no Youth Court duties claimed this day, only home detention calls.  (Jeter depo., ex. 16 thereto)  Despite this, Jeter filed for home detention overtime on one of her regular work days, Wednesday, and received credit.  (Jeter depo., ex. 16)

Q.     Okay, Let's look at the second page.  November 24th, home detention calls after hours and holidays, two hours per day. So you're claiming the two hours there, right?

A.     Uh-huh (affirmative response).

Q      Yes?

A.     Yes.

Q.     That's November 24th through November 28th, 2004?

A.     Yes.

Q.     Okay.  Were you in the building?

A.     No.  They were holidays.

Q.     November 24th is a Wednesday.

A.     It was a holiday.

Q.     That's not a holiday.

A.     I was off.

Q.     How do you know?

A.     Because I take time during Christmas.

Q.     Oh, so that was one of your off days?

A.     Yes.

Q.     This is Thanksgiving.

A.     Well, during Thanksgiving.  That's what I'm trying to -

Q.     So is it your testimony, then, that you were on vacation?

A.     Yes.

Q.     During this time?

A.     Yes.  And made plenty of calls.

Q.     And this is in - actually, it says you worked ten hours that day.  And then Thursday and
       Friday were holidays.  That's the Wednesday before Thanksgiving.

13

A.     No.  That has to be everything covered, all of the hours, not ten hours.

Q.     Look -

A.     It says ten hours regular pay.

Q.     Look here, ten hours.

A.     Okay.  Let me see.  It says ten to eight.

Q.     It says ten hours on the 24th of November.  You see that?

A.     First week -

Q.     If you were on a holiday, you wouldn't have put ten hours?

**A.     <u>I see that. I don't understand that.</u>**

Q.     Do you know for certain that you were on a holiday?

A.     It's sick leave.

Q.     No. Look at the 24th.

A.     I'm looking at the 24th.

Q.     There's no sick leave.  That's in the next week.   That shows to me you worked ten hours that day. You're claiming two for home detention, which is a Wednesday.

A.     I was at work.

Q.     So you were at work?

A.     On Wednesdays I do Youth Court.

Q.     So Wednesday was your regular workday, and here you are asking for overtime for home detention, right?

A.     Right.  Because I was in the building.

(Jeter depo., p. 179, line 4 - p. 181, line 21)(emphasis added)

Jeter first testified that November 24, 2004 was a holiday, then a vacation day, then a sick

14

leave day, and finally testified that it was a day when she was in the building doing Youth Court (because she claims if she was on the clock doing Youth Court, she could also ask for time on Home Detention). Jeter's testimonmy that it must have been a day that she was working on Youth Court after hours does not work either because she did not record any time for Youth Court on that date, November 24, 2004. (Jeter depo., ex. 16 thereto)

Jeter's testimony that she was told she could not receive overtime for making calls for home detention Monday - Thursday, unless she was in the building working on Youth Court, is discredited in its entirety by the overtime certification forms signed by Jeter. Her story is so contrary to the documentary evidence in this case, no rational trier of fact could find that she is entitled to relief. Jeter has acknowledged that she cannot explain the discrepancies between her testimony and the overtime certification forms she signed. A rational trier of fact would also not be able to explain the discrepancy or come to the conclusion that Jeter was entitled to relief. This Court should not accept Ms. Jeter's version of facts when ruling on Montgomery County's Motion for Summary Judgment. *Scott v. Harris,* 127 S.Ct. at 1776.

On the other hand, Montgomery County's evidence regarding the payment of overtime wages is supported by the overtime certifications that were signed and certified as correct by Jeter. (Howell Affidavit, ex. B-1; Jeter depo., exs. 11- 18 thereto) The overtime certification sheets signed by Jeter show that Jeter requested and received overtime pay or compensatory leave for home detention calls every time she made a written request. (See also Howell Affidavit, ¶ 11; Jeter depo., p.88, lines 22-24; p. 205, lines 7-10) These records also show that Jeter was compensated for home detention calls on her regular work days, Monday - Thursday, when she was at the facility or making calls away from the facility when Youth Court was not in session. (Jeter depo., exs. 11-18) These

15

records also show that Jeter was compensated for home detention calls when she covered for

Phoenix Martin on the weekends; and that she was compensated for home detention calls when she

was not at the facility, for instance when she was off for a holiday or on vacation. (Id.)  The overtime

forms signed by Ms. Jeter were relied upon by Montgomery County in the payment of overtime

wages to Jeter.  Montgomery County had no reason to doubt the accuracy of these records.  (Howell

Affidavit, ¶ 13)        29 U.S.C. § 207(a)(1) of the Fair Labor Standards Act ("FLSA") requires

employers to pay overtime to employees who are "employed" more than 40 hours per week.  The

term "employ" means "to suffer or permit to work."  20 U.S.C. § 203(g).  Jeter claims that she was

not compensated for making the home detention calls when she was not at the facility, Monday -

Thursday.  (Jeter depo.,p. 61, line 10 - p. 73, line 17; p. 144, line 9 - p. 145, line 20; p.189, line 12

p. 190, line 4)  Under the FLSA, work performed offsite must be counted as time worked only "[i]f

the employer knows or has reason to believe that work is being performed."  29 C.F.R. § 785.12

(1997).  For Jeter to recover overtime wages in this case, she must demonstrate (1) that she worked

overtime hours without compensation, and (2) that Montgomery County had knowledge, or should

have had knowledge, of this overtime work.  *Anderson v. Mt. Clements Pottery Co.,* 328 U.S. 680,

687, 66 S.Ct. 1187, 1192, 90 L.Ed.2d 1515 (1946).  "An employer does not have knowledge of

uncompensated overtime when an employee submits time sheets showing such overtime did not

occur."  *Gaylord v. Miami-Dade County,* 78 F.Supp.2d 1320, 1325 (S.D.Fla 1999); *see also,*

*Brumbelow v. Quality Mills, Inc.,* 462 F.2d 1324, 1327 (5th Cir. 1972)(finding that employee was

estopped from claiming more hours than those submitted in time sheets); *Newton v. City of*

*Henderson,* 47 F.3d 746, 748-49 (5th Cir. 1995)(finding employer did not have constructive

knowledge of overtime work where employer paid employee based  on the time sheets submitted

16

by employee); *Davis v. Food Lion,* 792 F.2d 1274, 1277-78 (4th Cir. 1986)(employer did not have constructive knowledge of overtime worked where employee falsified time sheets to under-report time); *Forrester v. Roth's I.G.A. Foodliner, Inc.,* 646 F.2d 413, 414 (9th Cir. 1981)("[W]here an employer has no knowledge that an employee is engaging in overtime work and that employee fails to notify the employer, or deliberately prevents the employer from acquiring knowledge of the overtime work, the employer's failure to pay for the overtime hours is not a violation of § 207").

In *Gaylord,* the court held that the plaintiff failed to demonstrate that the employer knew or should have known about his unreported overtime hours. Because most of the work was performed at home, the plaintiff's supervisor would have no independent means of knowing how plaintiff spent his time at home. Additionally the time sheets submitted by the plaintiff did not include any of the requested time. Accordingly, there was insufficient evidence of knowledge of the work on the part of the employer. *Id.* at 1326-27.

The same is true in this case. Although Jeter testified that she was told she could not get overtime for home detention calls made on Monday - Thursday if she was offsite, this testimony is utterly discredited by the overtime forms signed by the Plaintiff. Under *Scott v. Harris,* the Court should not accept this version of the facts. What can be accepted by the Court is that Montgomery County had certain procedures in place for the submission of certifications or overtime work. (Jeter depo., p.124, line 2 - p.129 line 18; Howell Affidavit, ¶ 10) Jeter submitted a substantial amount of overtime certification sheets for overtime for various things, including Youth Court, Family Guidance Program, holiday time and home detention calls. (Howell Affidavit, ex. B thereto) Jeter was paid or received compensatory leave each time she submitted an overtime certification form. (Howell Affidavit, ¶ 11; Jeter depo., p. 88, line 22 - p . 89, line 3; p. 204, line 22 - p. 205, line 10;

17

Wooten Affidavit, ¶ 5)  These certifications do not indicate that Jeter worked any additional, uncompensated time for home detention calls.  Defendant Montgomery County would have no way of knowing if Jeter made home detention calls outside the facility and was not getting paid.  The instructions Wooten gave to both Jeter and Phoenix Martin (the other employee making home detention calls) was that they could make calls at any time they chose, and even during work hours. (Wooten Affidavit, ¶ 5)  Martin made all of her calls during her work hours, with the exception of one occasion after hours, and one time on a holiday.  (Martin Affidavit, ¶ 4; Howell Affidavit, ex. B, pp. 5-6; ex. "C" thereto, Overtime Certification Sheet for Period of December 20, 2004 - January 2, 2005)  Jeter even testified that she could make the calls  at any time and from any location she chose.  (Jeter depo., p. 150, lines 3-22) Jeter's supervisor Wooten saw Jeter leave early and arrive late to work, and therefore assumed she was flexing her hours while doing the home detention calls, just as she had flexed in the past. (Wooten Affidavit, ¶ 5) Neither Howell nor Wooten suffered or permitted Jeter to work overtime without appropriate compensation/leave.  (Howell Affidavit, ¶ 13; Wooten Affidavit, ¶ 5) They also never told Jeter that she could not get overtime pay/leave for home detention calls.  (Howell Affidavit, ¶ 11; Wooten Affidavit, ¶ 5)

In *Newton v. City of Henderson,* 47 F.3d 746 (5th Cir. 1995), the court found that the employer did not have constructive knowledge that a police officer had worked overtime hours where the officer did not record the hours on his time sheets.  The officer argued that his supervisors had access to information regarding his task force activities and a separate list he kept of overtime worked, and that he told them about his work.  *Id.* at 749.  There were also specific procedures in place by the City of Henderson, and certain forms to complete, in order for employees to receive overtime.  *Id.*  The court held that if it were to hold that the city had constructive knowledge of the

18

overtime, then it would essentially be stating that the city did not have the right to require a public employee to abide by the procedure for obtaining overtime. *Id.* There was also evidence that the employer reasonably believed that the officer was flexing his time to account for any additional hours worked in the week, which also negated a finding of knowledge on the part of the employer that overtime had been worked. *Id.*

The same is true in this case. There is no competent evidence of actual or constructive knowledge of overtime work by Jeter on the part of Defendant Montgomery County. Where an employee withholds information from the employer and the employer has no knowledge of the overtime work, there is no violation of the FLSA. (Affidavit of Dr. James A. Buford, Jr., ¶ 16) Jeter's FLSA claims for overtime wages should therefore be dismissed.

Additionally, Jeter is estopped from seeking additional overtime for home detention calls. In *Brumbelow v. Quality Mills, Inc.,* 462 F.2d 1324 (5th Cir. 1972), the employee misrepresented the amount of overtime hours worked on his time sheets. There was no evidence that the employee was told to falsify his time sheets, or that the employer knew or should have known of the additional work. The court therefore held that the employee was estopped and could not profit from her own wrong in furnishing false data to the employer. *Id.* at 1327.

There is no competent evidence before the Court that Jeter was forced to submit inaccurate time sheets by Montgomery County or any representative thereof. It is undisputed, however, that Jeter was aware of Montgomery County's policies and procedures for obtaining overtime pay/leave and that she regularly submitted overtime certification sheets with the intention that the forms be acted upon by Montgomery County. There is also no dispute that Montgomery County relied upon these forms in compensating Jeter. (Howell Affidavit, ¶ 13) Jeter should therefore be estopped from

recovering overtime wages from Defendant Montgomery County. *Brumbelow,* 462 F.2d at 1327; *see also, Valentine v. Harris County,* Docket No. Civ.A.H-02-4910 at * 1-2 (March 6, 2006 S.D.Texas 2006).

### B.    Race Discrimination Claim

<u>Preemption</u>.

Jeter also asserts a claim for racial discrimination against Defendant Montgomery County.

In her deposition, Jeter testified as follows:

> Q.    .. . you have a claim for racial discrimination.  Tell me about that.  Why are you claiming you're being discriminated against because of race and how?
>
> A.    Because the only people who had any dealings with home detention was me and two white women.  And they were compensated whenever they chose.  Amanda only did it once.  So she was one time.
>
> Q.    You mean, they got overtime?
>
> A.    Yeah.
>
> Q.    Okay.  So is your claim on racial discrimination basically that a white person got paid overtime for home detention, but you didn't get paid overtime for home detention?
>
> A.    One of them.

(Jeter depo., p.287, line 22 - p. 288, line 13)[1]

Jeter's racial discrimination claim is nothing other than a claim seeking overtime wages for

---

[1] Jeter  also testified that she was also subjected to racial discrimination because she heard from other employees that Howell had said that she was out to pasture and would never be a supervisor.  (Jeter depo., p. 289, line 13 - p. 290, line 3; p. 292, line 8 - p. 192, line 24) These statements are clearly hearsay.  Jeter also cannot produce any evidence that these alleged statements were motivated by race or that she was treated differently than similarly situated employees outside her protected class.  *See e.g., Thigpen v. Bibb County,* 223 F.3d 1231, 1237 (11th Cir. 2000), abrogated on other grounds by *Nat'l R.R. Passenger Corp v. Morgan,* 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002).

her work on the home detention program.  The FLSA provides a comprehensive enforcement scheme that is incompatible with the individual enforcement of rights under Section 1983.  *Kendall v. City of Chesapeake, Virginia,* 174 F.3d 437, 443 (4th Cir. 1999); *see also, Jarrett v. Alexander,* 235 F.Supp.2d 1208, 1211 (M.D.Ala. 2002)(holding that the FLSA precludes a § 1983 claim that seeks to enforce FLSA rights, but a §1983 claim for an independent violation is not preempted); *see also, Stone v. McGowan,* 308 F.Supp.2d 79, 87-88 (N.D.N.Y.2004).

In *Kendall,* employees brought a § 1983 claim alleging that the city had fraudulently induced them to sign releases of their claims under the FLSA.  The court stated that the issue was whether the employees could use § 1983 "to enforce their rights to overtime compensation under the Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 201-62 (1988)."  *Id.*  at 439.  The court further stated that if a plaintiff asserts the violation of a federal right, the plaintiff can bring a § 1983 action, but only if Congress has not foreclosed recourse to that statute.  *Id.*  According to the court, "[c]ongress can manifest its intent to preclude use of § 1983 either expressly "or impliedly, by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983."  *Id., citing Blessing v. Freestone,* 520 U.S. 329, 117 S.Ct. 1353, 1359-60. The court held that "the elaborate remedial scheme provided in the FLSA demonstrates a congressional intent to prohibit § 1983 actions to enforce such FLSA rights."  *Id*

Similarly, in *Stratton v. State of Alabama,* Docket No. 2:04 CV 1053MEF (M.D.Ala. March 23, 2006), the plaintiffs alleged that the defendants failed to pay wages and other benefits owed to them, and that defendants' actions were violations of the takings clause of the Fifth Amendment and the equal protection provisions of the Fifth and Fourteenth Amendments.  The court held that although the plaintiffs appeared to assert a constitutional violation that was independent of a

21

violation of the FLSA, they were in essence seeking wages and other benefits which were rights protected by the FLSA.  The plaintiffs' § 1983 claims were therefore held to be preempted by the FLSA.

Jeter is also seeking overtime wages which is a right protected by the FLSA.  Jeter is thus attempting to enforce FLSA rights through § 1983 which cannot be done.  Jeter's § 1983 equal protection claim should therefore be dismissed.

Equal Protection.

Jeter's equal protection claim should also be dismissed because Jeter cannot produce substantial evidence of the elements of a race discrimination claim based on a violation of equal protection.   In order to establish an equal protection violation, a plaintiff must show that he was treated differently that other similarly situated employees as a result of intentional discrimination by the defendants.  *Personnel Adm'r. v. Feeney,* 442 U.S. 256, 272, 99 S.Ct. 2282 (1979); *Washington Davis,* 426 U.S. 229, 239-48, 96 S.Ct. 2040, 2047-52, 48 L.Ed.2d 597 (1976); *Thigpen,* 223 F.3d at  1237.

Jeter claims that white employees Amanda Ashurst and Phoenix Martin were treated better than she because they got overtime on the home detention program any time they chose.  (Jeter depo., p.287, line 22 - p. 288, line 13)  Jeter testified that Ashurst covered for Jeter on one occasion by making the home detention calls for Jeter while Jeter was out of town.  (Jeter depo., p. 195, lines 4-14; p. 288, lines 4-5; p. 299, lines 19-21)  Ashurst, however, is not similarly situated to Jeter.  Ashurst only did the home detention calls on one occasion.  Jeter on the other hand, was one of two employees whose regular duties included making the home detention calls for approximately four years.  To be "similarly situated," comparators must be "prime facie identical in all relevant

22

respects." *Campbell v. Rainbow City, Alabama,* 434 F.3d 1306, 1314 (11th Cir.), cert. denied, __ U.S. __, 127 S.Ct. 559, 166 L.Ed.2d 410 (2006). Ashurst and Jeter were not similarly situated and thus Ashurst is not a sufficient comparator.

Jeter also cannot show that Ashurst was treated differently than Jeter. By Jeter's own admission, Ashurst covered for Jeter on one occasion and was paid. Jeter also received overtime pay/compensatory leave when she covered for Phoenix Martin on the weekends. (Jeter depo., p. 143, lines 18-24) Therefore, both Jeter and Ashurst were compensated for home detention calls they made while covering for another employee. As a result, Jeter and Ashurst were not treated differently and Jeter's equal protection claim fails.

Phoenix Martin is also not a sufficient comparator. Martin was responsible for making home detention calls on the weekends, Friday, Saturday and Sunday. Jeter was responsible for making the home detention calls on Monday - Thursday. Almost all of Martin's home detention calls were made by Martin during her regular work hours. (Martin Affidavit, ¶ 4) On one occasion Martin made the calls on a holiday (Howell Affidavit, ex. B, p. 6, Overtime Certification Sheet for December 24, 2004), and received leave/pay, and on one other occasion Martin made the calls after hours on her regular work day, Friday, and received leave/pay. (Howell Affidavit, ex. B, p. 6, Overtime Certification Sheet for December 17, 2004) All other calls made by Martin for which she received overtime pay/compensatory leave were done while she covered for Jeter on Monday - Thursday. (Howell Affidavit, ex. B, pp. 5-6)

According to Jeter, her home detention calls that are at issue in this case were made after hours on her regular work days, Monday - Thursday. Jeter did not make these calls during her regular hours like Martin. Jeter claims that she could not get pay or leave for the calls she made

after hours offsite.  Martin, however, only made calls after hours on one occasion.  Jeter and Martin are therefore not sufficiently similar in all relevant respects.

Moreover, the undisputed evidence is that Jeter and Martin were not treated differently.  Jeter claims that she was not getting overtime pay/leave for her offsite home detention calls made after hours, Monday - Thursday.   The overtime certification sheets, however, show without dispute that Jeter is wrong and that she did in fact receive overtime pay/leave when she made home detention calls offsite on  her regular workdays.  When questioned about this, Jeter merely stated that she could not explain it.   Martin made only one call after hours.  (Howell Affidavit, ex. C, p. 2, December 17, 2004)  It is not certain whether the call was made on the premises or offsite.  In any event, the overtime certification sheets show that both Martin and Jeter received overtime pay/compensatory leave for after hours calls, even though Martin only made one such call.  In this respect, there  is no difference in the way they were treated.  Jeter's equal protection claim cannot survive because she cannot show she was treated differently than Martin.

Jeter also cannot demonstrate any racial discriminatory intent on the part of Defendant Montgomery County.  The evidence is undisputed that Jeter was paid overtime or received leave each time she submitted a signed overtime certification form.  Jeter cannot put forth any evidence that Montgomery County's actions were motivated by race or that Montgomery County treated similarly situated employees outside Jeter's protected class differently than Jeter.  Jeter's equal protection claim should therefore be dismissed.

§ 1983 Liability of Montgomery County

Jeter also cannot establish liability on the part of Montgomery County under § 1983. The question of liability on the part of a local governmental entity  is only relevant when a constitutional

24

violation is found. *Powell v. Barrett,* 496 F.3d 1288, 1318 (11th Cir. 2007). As set forth above, there is no evidence of intentional discrimination against Jeter based on race. Jeter's claim against Montgomery County fails for another reason as well. "The Supreme Court has placed strict limitations on municipal (county) liability under § 1983." *Grech v. Clayton County,* 335 F.3d 1327, 1329 (11th Cir. 2003). A county will only be liable if it caused the constitutional violation; the county cannot be liable under a theory of *respondeat superior. Quinn v. Monroe County,* 330 F.3d 1320, 1325 (11th Cir. 2003). The plaintiff must identify a county policy or custom that caused the plaintiff's injury. *Grech,* 335 F.3d at 1329. The plaintiff must also show that the policy or custom was the "moving force" behind the constitutional violation. *City of Canton v. Harris,* 489 U.S. 378, 385, 109 S.Ct. 1197 1203, 103 L.Ed.2d 412 (1989).

County liability may only arise with regard to an employment decision if the decision-maker "possesses *final* authority to establish municipal policy with respect to the action ordered." *Quinn,* 330 F.3d at 1325, citing *Pembaur v. City of Cincinnati,* 475 U.S. 469, 481, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). There can be no liability on the part of a county for a subordinate official's actions when the final policymaker delegates decision-making discretion to the subordinate official, but maintains the power to review the exercise of that discretion. *Quinn,* 330 F.3d at 1325. In other words, an official is not a final policymaker for a county in a particular subject area if the official's decisions in that area are subject to meaningful administrative review. *Id.* at 1325; *see also, Holloman ex re. Holloman v. Harland,* 370 F.3d 1252, 1292 (11th Cir. 2004)(a governmental employee is considered a final policymaker "only if his decisions have legal effect without further action by the governing body, and if the governing body lacks the power to reverse the . . . employee's decision.")

Jeter complains that Howell and Wooten would not allow her to turn in overtime forms for home detention calls made outside the facility on her regular work days, Monday-Thursday, and that she was thus treated less favorably than similar situated employees outside her protected class. To hold Montgomery County liable, Jeter must demonstrate that Howell and Wooten had final policymaking authority for Montgomery County on the subject of overtime compensation. Jeter cannot meet this burden.

It is undisputed that Jeter is employed in the classified service for Montgomery County and that her employment is governed by the rules and regulations of the Montgomery City-County Personnel Board. (Howell Affidavit, ¶ 3, ex. A thereto, p. 4; Montoya Affidavit, ¶¶ 2-3; Jeter depo., p. 35, line 14 - p. 36, line 22) Rule VIII of the Personnel Board Rules and Regulations governs overtime for county employees like Jeter. (Howell Affidavit, ex. A thereto, p. 27) Howell and Wooten have no authority to change or amend this rule. (Howell Affidavit, ¶ 10) Only the Personnel Board may adopt rules and amend the rules applicable to overtime for county employees. (Howell Affidavit, ex. A thereto, p. 4, §§ 3, 5) Rule VIII, § 13 of the Personnel Board rules further provides for a review by the Personnel Board of any situation related to employment status or condition of employment. (Id. at p. 44)

It is clear that neither Howell nor Wooten were the final policymakers for Montgomery County regarding the payment of overtime. The Personnel Board made the rules regarding overtime compensation and has the legal authority to review any situation related to employment status or condition of employment. Jeter's § 1983 claim against Montgomery County should therefore be dismissed

C.      **Retaliation Claim.**

26

A prima facie case of retaliation under the FLSA requires the plaintiff to show that (1) she engaged in protected activity; (2) she subsequently suffered an adverse action by the employer; and (3) a causal connection existed between the employee's activity and the adverse action. *Wolf v. Coca-Cola Co,* 200 F.3d 1337, 342 (11th Cir. 2000). To show an adverse employment action, the plaintiff must show "that a reasonable employee would have found the challenged action materially adverse, which . . . means that it well might have dissuaded a reasonable worker" from engaging in the protected activity. *Burlington Northern & Santa Fe Railway Co.,* ___ U.S. ____, 126 S.Ct. 2405, 2415 (2006).

A plaintiff may establish causation by demonstrating that the protected activity and the adverse employment are not completely unrelated. *Meeks v. Computer Assocs.,* 15 F.3d 1013, 1021 (11th Cir. 1994). Causation may be shown by demonstrating that there is a close temporal proximity between the adverse action and the protected activity. *Farley v. Nationwide Mut.Ins.Co.,* 1997 F.3d 1322, 1337 (11th Cir. 1999).

If the elements of the prima facie case are shown, the burden shifts to the employer to offer a non-discriminatory reason for the adverse action in question. The plaintiff must then demonstrate that the proffered reason is merely a pretext for retaliation. *Farley,* 197 F.3d at 1336.

<u>Cancellation of Home Detention Program</u>

In her Second Amended Complaint, Jeter claims that Howell canceled the home detention program in retaliation for her complaint about overtime. (Second Amended Complaint, p. 4) Jeter's attorney sent a letter to Howell and Wooten by fax on January 31, 2006, notifying them that Jeter was seeking overtime for making home detention calls. (Howell Affidavit, ¶ 14, ex. D) Although the exact date of cancellation of the home detention program is not known, an examination of Jeter's

overtime certification forms shows that she was making home detention calls and seeking overtime for these calls on May 9, 2006. (Howell Affidavit, ex. E, Overtime Certification Sheet for period of May 8, 2006 - May 21, 2006)

A plaintiff can satisfy the causal relation between an adverse employment action and protected activity if she establishes that there was a "close temporal proximity" between the defendant's knowledge of protected activity, and the adverse action. *Higdon v. Jackson,* 393 F.3d 1211, 1220 (11th Cir. 2004). The Supreme Court has held that "mere temporal proximity between . . knowledge of protected activity and an adverse . . . action . . must be 'very close.;" *Clark County Sch Dist. v. Breeden,* 532 U.S. 268, 273 (2001). The Eleventh Circuit has found a gap of three months to be insufficiently close in a retaliation case. *Higdon,* 393 F.3d at 1220; *see also, Kipp v. Mo. Highway & Transp. Comm'n,* 280 F.3d 893, 397 (8th Cir. 20002)(two month gap insufficient); *Ruhling v. Tribune Co.,* Docket No. CV-04-2430(ARL) at * 19 (E.D.N.Y Jan 3, 2007)(passage of more than two months will defeat the retaliatory nexus).

The suspension of the Home Detention Program is not sufficiently close in time to the receipt of the January 31, 2006 letter from Jeter's attorney. Jeter thus cannot establish a causal connection. Jeter's retaliation claim, based on the suspension of the Home Detention Program, should therefore be dismissed.

Moreover, Defendant Montgomery County has presented valid and legitimate reasons for discontinuing the home detention program. The home detention program originated with Judge Dorrough who, by January of 2006, was no longer the presiding judge at the MCYF. (Howell Affidavit, ¶¶ 7, 15) Since the inception of the Home Detention Program, there were misgivings about its reliability and validity. (Howell Affidavit, ¶¶ 9, 15) Both Jeter and Martin had discussed

the shortfalls of the program with Howell while the program was active.  (Howell Affidavit, ¶ 15)  The program was continued for as long as it was because Judge Dorrough wanted the program.  (Wooten Affidavit, ¶ 6)  There have since been discussions underway by Howell to implement electronic monitoring which is a far superior method of home monitoring.  (Howell Affidavit, ¶ 15; Wooten Affidavit, ¶ 6)

Jeter must demonstrate that these reasons for cancellation of the program (Exit by Judge Dorrough and shortfalls in the program) are a pretext for retaliation against her.  To show pretext, a plaintiff must produce evidence sufficient "to permit a reasonable fact-finder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Combs v. Plantation Patterns,* 106 F.3d 1519, 1528 (11ᵗʰ Cir. 1997).   Conclusory allegations, without more, are not sufficient to show pretext.  *Mayfield v. Patterson Pump Co.,* 101 F.3d 1371, 1376 (11ᵗʰ Cir. 1996).   The plaintiff must meet the proffered reason "head on and rebut it." *Champan v. Al Transport,* 229 F.3d 1012, 1030 (11ᵗʰ Cir. 2000).

Jeter must rebut the proffered reasons by showing them so implausible that they are not worthy of credence. Jeter cannot meet this burden.  Jeter's retaliation claim based on cancellation of the home detention program should therefore be dismissed.

Money Cases

Jeter also claims that when the home detention program was canceled, she was given an increased work load.  Specifically, Jeter complains that she was given restitution or money cases to handle which was in retaliation for filing her claim/complaint about overtime.  (Jeter depo., p. 245, lines 11-22)

Defendant Montgomery County has presented undisputed evidence that the decision to

29

transfer the money cases to Jeter was made after cancellation of the home detention program. (Howell Affidavit, ¶ 16) Therefore, because this action occurred even later in time that the cancellation of the home detention program, it is subject to the same arguments regarding temporal proximity set forth in the preceding paragraphs. The act of giving Jeter the money case load is not sufficiently close in time to Howell's receipt of the January 31, 2006 letter from Jeter's attorney.

Moreover, Jeter cannot rebut the proffered reasons for transfer of the money cases to Jeter. Howell had already decided long before this that he was going to assign these cases to one of the probation officers in the specialized unit, like Jeter, who did not have a traditional case load. (Howell Affidavit, ¶ 16) These cases were given to Jeter because she had the lightest work load of all of the probation officers in the specialized unit. (Id.) It made sense to give the money cases to Jeter because she no longer was working on the home detention program. (Id.) These legitimate reasons for the decision cannot be rebutted by Jeter.

<u>Change in Youth Court hours</u>

Plaintiff also alleges that her hours on Youth Court were changed to a flex schedule of only 40 hours per week that is now preventing her from obtaining overtime. (Jeter depo., p. 55, line 9 - p. 60, line 9; p. 275, line 6 - p. 276, line 2; p. 279, lines 19-21; ex. 4 to Jeter depo.) Again, this was done almost a year after Jeter made her claim for overtime in January of 2006. This is not sufficiently close in time to Howell's receipt of the January 31, 2006 letter from Jeter's attorney.

Defendant Montgomery County has also presented undisputed evidence that this change in work schedule was part of a larger agency-wide effort to streamline work schedules and reduce the amount of overtime being paid by the MCYF. (Howell Affidavit, ¶ 17; Wooten Affidavit, 7) Additionally, Jeter's primary duty is Youth Court. It was not feasible for Jeter to regularly work

overtime each week in order to perform her primary job duties. (Wooten Affidavit, ¶ 7) All employees have been affected by the agency-wide effort to reduce overtime and streamline schedules. (Howell Affidavit, ¶ 17, ex. G, ex. H; Wooten Affidavit, ¶ 7)

It is also undisputed that Jeter is still eligible to receive overtime pay or compensatory leave if she works over 40 hours per week on her flex Youth Court schedule, or when holidays fall on Monday, which is her day off. (Wooten Affidavit, ¶ 8) In fact, Jeter picked Monday as her off day for her new flex schedule. (Wooten Affidavit, ¶ 7) Jeter has in fact received overtime pay and compensatory leave since her hours were changed. (Jeter depo., p. 59, lines 1-24; Wooten Affidavit, ¶ 8; Howell Affidavit, ex. E) Jeter therefore cannot demonstrate that her hours on Youth Court were changed in retaliation for her complaint about overtime. Her claim should therefore be dismissed. *See Mack v. Strauss,* 134 F.Supp.2d 103, 113-14 (D.D.C.2001)(holding that increased workload unaccompanied by some adverse change in the terms, conditions or privileges of employment did not constitute an actionable injury). "Mere inconveniences and alteration of job responsibilities will not rise to the level of adverse action." *Stewart v. Evans,* 275 F.3d 1126, 1135 (D.C.Cir. 2002). "Employers are given discretion to assign work equally to employees as long as " 'the decision is not based upon unlawful criteria.'" *Moore v. Ashcroft,* 401 F.Supp.2d 1, 27 (D.C.Cir. 2005)**.**

Jeter also claims that the following actions amount to retaliation:

Probation Supervisor Beverly Wise checked the sign-in/sign-out sheets to spy on Jeter. (Jeter depo., p. 246, line 9 - p. 247, line 18)

Howell did not speak to her and walked in the other direction when he saw her. (Jeter depo., p. 271, lines 5-13)

Requests for personal information by Administrative Assistant Lynn Peavey from Jeter's

31

physician regarding Jeter's request for FMLA leave.  (Jeter depo., p. 271, line 15 - p. 273, line 6)

Judge Capell, presiding judge of the Juvenile Court, (who is not an employee of Montgomery County) said Jeter was not a team player.  (Jeter depo., p. 248, line 18 - p. 257, line 13)

Michael Provitt told her that Howell said that Jeter was out of line for filing a claim for overtime.  (Jeter depo., p. 244 line 24 - 245, line 10)

These remaining challenged actions are not sufficient to support a retaliation claim.  No reasonable fact-finder would conclude that these actions are  materially adverse in the sense that they might have "dissuaded a reasonable worker from making or supporting a charge of discrimination."  *White,* 126 S.Ct. 2415.  This conduct is of the type that the Supreme Court in *White* characterized as "petty slights, minor annoyances, and simple lack of good manners that employees often encounter at work.  *Id* ; *see also, Dekalb County School Dist.,*  145 F. 3d at 1219-20 (rude behavior, accusations of not reporting to correct location, and fact that others were watching plaintiff did not amount to adverse action).

Additionally, with respect to being spied upon, Probation Supervisor Wise is required to know the whereabouts of the probation officers and it is her duty to check the sign-in/sign-out sheet.  (Wise Affidavit, ¶¶ 2-3) And, with respect to the requests for information from Jeter's physician, this was merely a request for clarification regarding Jeter's request for leave.  (Peavey Affidavit, ¶ 4)  Moreover, this occurred in July of 2007, over a year after Jeter filed her claim for overtime.  (Peavey Affidavit, ¶ 4)   This weighs heavily against a finding of causation.

In summary, Jeter cannot produce sufficient evidence to establish a prima facie case of retaliation to create a genuine issue of material fact on her retaliation claim.  She also cannot

32

produce sufficient evidence of a causal connection between the challenged acts and her claim for overtime wages. This is not a case where the temporal proximity between her claim and the alleged materially adverse actions is sufficient to permit an inference of a causal connection. Jeter also cannot produce other evidence sufficient to establish a causal connection between her claim and the challenged acts. Jeter also cannot produce any evidence that would allow a reasonable fact-finder to conclude that Montgomery County's proffered reasons for these acts are pretextual. Defendant Montgomery County is therefore entitled to summary judgment on Jeter's retaliation claim.

## IV. CONCLUSION

Based on the foregoing, Defendant Montgomery County respectfully requests that this Court enter summary judgment in its favor as to all counts in Jeter's Complaint, as amended.

s/Constance C. Walker
Thomas T. Gallion, III (ASB-5295-L74T)
Constance C. Walker (ASB-5510-L66C)
Tyrone C. Means (ASB-760-S80T)
Christopher K. Whitehead (ASB-9762-A45C)
Counsel for Defendant Montgomery County

**OF COUNSEL**

**HASKELL SLAUGHTER YOUNG & GALLION**
Post Office Box 4660
Montgomery Alabama 36103-4660
Telephone: (334) 265-8573
Facsimile: (334) 264-7945
**OF COUNSEL:**

**THOMAS MEANS GILLIS & SEAY, PC**
Post Office Drawer 5058
Montgomery, Alabama 36103-5058

(334) 270-1033
(334) 260-9396 Fax


## CERTIFICATE OF SERVICE

I hereby certify that on the 21st day of November, 2007, I caused a copy of the foregoing to be mailed to the Plaintiff Mary W. Jeter by placing a copy of the same in the United States mail, postage prepaid:


Ms. Mary W. Jeter
6016 Bolingbrook Drive
Montgomery, Alabama 36117



s/Constance C. Walker
Of Counsel